**311**    *THOMAS J. FLACK, and Others *v.* CLAUDE B. CHARRON, John M. Townsend, Charron, Posey & Co., and Charron, Townsend & Co.

*Decided June 26th, 1868.*

Partners ; fraudulent transfers ; creditors' liens.    Vacat-ings ; fraudulent conveyances ; no judgment by creditor nec-essary.

While the members of a solvent partnership by their own acts may convert the joint property of the partnership into the separate property of individuals, or into the joint property of two or more partners, when done in good faith, such conversions or transfers, when fraudu-lent and calculated to hinder and delay the partnership creditors, are void as against such creditors and will not be allowed to operate to their prejudice.    (a)                                    p. 318

While it is true that the joint creditors, as such, have no immediate or direct lien upon the partnership property, yet they have a derivative or secondary lien that can be worked out and made effectual through the lien of the partners; and which *quasi* or secondary lien of the cred-itors, constitutes an equity, that courts will recognize and protect, against the meditated fraud of the partners themselves.    (b)    p. 318

And hence while the joint creditors have no right to impeach or call

---

(a)    Cf. *Collier v. Hanna,* 71 Md. 253.

(b)    See *Glenn v. Gill,* 2 Md. 1, notes; *Sanderson v. Stockdale,* 11 Md. 564, note (b).

into question the *bona fide* sales or transfers of the partnership property, it has been uniformly held that it was necessary to the validity of such sales or transfers, as against the creditors, that they should be fair and *bona fide;* and where they have been found otherwise, they have been declared inoperative as against creditors. (*c*)                    p. 318

And such transfers are embraced in the very terms of the Code of Pub. Gen. Laws, which declares, that, "in no case of a proceeding in equity to vacate any conveyance or contract, or other act, as fraudulent against creditors, shall it be necessary for any creditor or plaintiff in the cause to have obtained a judgment at law on his demand, in order to the relief sought in the case." (*d*)                    p. 323

Appeal from the Circuit Court of Baltimore City.

This suit was instituted in the Circuit Court of Baltimore City by Thomas J. Flack & Sons and others, creditors of the firm of John B. Charron and others, at the time of its disso-*lution, to obtain an injunction against said firm, and **312** the firms of Charron, Posey & Co., and Charron, Townsend & Co., and for a receiver to take charge of their affairs.

The injunction was granted, and afterwards the defendants answered the bill, and evidence was taken. The case was then heard upon the motion to dissolve, and the court below (Pinkney, J.,) dissolved the injunction as to the two last named firms, but continued it and appointed a receiver as to the firm of J. B. Charron & Co. From this order an appeal was taken by the complainants, and also by the defendants, John B. Charron, Claude C. Charron, and John P. Posey.

Said appeals were argued before Bartol, C. J., Nelson, Stewart and Alvey, JJ.

*S. Teackle Wallis* and *Bernard Carter,* for the complainants below:

It is supposed that whatever principles of law are necessary to be invoked in behalf of the complainants, may be found stated in *Sanderson v. Stockdale,* 11 Md. 563.

The bill in this case was drawn in view of the principles there enunciated as warranting the interposition which the com-

(*c*)   Cited in *Gebhart v. Merfeld,* 51 Md. 325.

(*d*)   See *Christopher v. Christopher,* 64 Md. 588; Code of Pub. Gen. Laws, Art. 16, sec. 46; Act of 1898, ch. 254; *cf.* also *Frederick Co. Bank v. Shafer,* decided by the Court of Appeals, January 5, 1898.

plainants asked of the court, in the way of an injunction and receiver.

The transfer of the whole stock in trade owned by the firm of John B. Charron & Co., as made in February, 1867, to those to whom it was transferred, was not a *bona fide* sale, for a fair and valuable consideration, but was, on the contrary, a fraudulent contrivance designed by the parties thereto, for the purpose of cheating the creditors of John B. Charron & Co., and it was neither *bona fide,* nor made for a *valuable* consideration. The complainants understand the case of *Sanderson v. Stockdale,* 11 Md. 563, to recognize the well settled principle that creditors of a partnership, while having no judgment, nor lien by execution on the stock in trade of a partnership, cannot deny

**313** to one partner of the firm the right to sell *his interest in the stock to his co-partner or to a stranger, clear of any right of the creditor to follow that stock, provided the sale is *bona fide,* and for a *valuable consideration.* The same case as emphatically establishes the converse of this, viz. : that if the sale, or transfer, in the case above put, is *not bona fide,* but a fraudulent device to delay, hinder or defraud creditors, it is void as against them, and may be set aside, and by proceedings and in the mode adopted in this case.

Nor in such a case will the creditors' right thus to proceed be prevented, even though there was a valuable consideration paid, if the transaction was intended to operate as a fraud on creditors. This is the well known operation and construction of the Statute of Elizabeth.

The complainants claim, therefore, that whether the evidence in this case shows, or does not show, clearly and affirmatively, that the firm of John B. Charron & Co. was insolvent in February, 1867, when this transfer was made, yet if they show that the transaction was fraudulent in its design, or show that it was made without a valuable consideration, then it will follow that it was altogether null and void as against them.

The complainants were creditors of J. B. Charron & Co. at the time of the transfer in question, and as such creditors, it is plain beyond all controversy, that the whole assets, *stock in trade,* as well as book accounts, etc., were in the first place applicable to the debts due them before either partner could appropriate any part thereof to himself, or transfer them to any

one else, except in good faith and for a valuable consideration. The idea that that part of the assets which alone had a certain value, viz.: the stock in trade, could be appropriated by the partners themselves, and the creditors be compelled to take the chances of the collection of debts due to the firm, is a monstrous proposition, in answer to which it cannot be necessary to cite authorities.

The transfer of the stock in trade of the firm of J. B. Charron & Co., as made in February, 1867, and all that was done *in connection therewith, was a fraudulent device and **314** contrivance, intended, designed and effectual, to deprive the complainants of their just right to have the benefit of the application of the proceeds of the stock in trade to the liquidation of their debts.

As a second ground on which this transfer is inoperative as against the complainants, it was not made for a valuable consideration, and the absence of *consideration* is itself a strong ground on which to presume fraud.

*J. C. Carpenter,* for the appellant, John P. Posey:

The withdrawal of John P. Posey from the solvent firm of Charron, Posey & Co. having been final, and his interest therein having been sold for a valuable and *bona fide* consideration, the sale thereof cannot be impugned by the creditors of J. B. Charron & Co. Especially as upon the dissolution of the latter, the portion of stock assigned him became his separate and individual property. *Glenn v. Gill,* 2 Md. 16; Story on Part. sec. 358; *Griffith v. Buck,* 13 Md. 114.

The sworn answer of John P. Posey, as admitted in the opinion of the court below, denies all the material facts alleged against him in the bill of complaint, and there being no testimony in support of said bill, as required by the established law in injunction cases, the Judge erred in continuing the injunction and appointing a receiver. The injunction should have been dissolved. *Thompson v. Diffenderfer,* 1 Md. Ch. 495; *Gelston v. Rullman,* 15 Md. 267; *Feigley v. Feigley,* 7 Md. 563; *Wood v. Patterson,* 4 Md. Ch. 336; *Harris v. Sangston,* 4 Md. Ch. 396.

It is the settled law in cases of this kind, that an injunction will not be continued, or a receiver appointed, unless there is

fraud and imminent danger clearly proved; and, though fraud is the only ground upon which the bill of T. J. Flack and others rests, there has not been one particle of evidence offered to support the charge, and it is emphatically denied in the answer.   Mr. Posey, by their own witness, Stephen Richard,

**315**   *is proved to be a man of strict honesty and integrity; the assets of J. B. Charron & Co. are proved to have been faithfully and diligently collected and disbursed; two-thirds of the creditors have already been paid, and the remaining one-third were being satisfied as fast as funds could be obtained; and the affairs of the late firm were being settled in such a manner as to serve the best interests of its creditors.   Therefore, as the court never wantonly appoints a receiver, or grants an injunction, but only on the showing of the strongest necessity, the judgment of the court below was in error both as regards the law and the facts of this case, and should be reversed.   *Drury v. Roberts,* 2 Md. Ch. 159; *O'Bryan v. Gibbons,* 2 Md. Ch. 10; *Clark v. Ridgely,* 1 Md. Ch. 71; *Uhl v. Dillon,* 10 Md. 503; *Nusbaum v. Stein,* 12 Md. 318; *Hubbard v. Hubbard,* 14 Md. 360; *Blondheim v. Moore,* 11 Md. 365; *Williamson v. Wilson,* 1 Bland, 425, 426.

*Wm. C. Schley,* for the appellant, John B. Charron:

In addition to the above cases, cited *Bouldin v. Baltimore,* 15 Md. 18; *Triebert v. Burgess,* 11 Md. 452.

*William Schley* and *Wm. J. Waterman,* for the appellees, Charron, Townsend & Co.:

In any view of the case, were the complainants in a position to give them any standing in a Court of Equity?   Have they obtained a lien by judgment and execution, or are they merely ordinary creditors plunging at once into equity?   *Wiggins v. Armstrong,* 2 John. Ch. 144 ; *Uhl v. Dillon,* 10 Md. 500; *Georgia v. Brailsford,* 2 Dallas, 402; *Shirley v. Watts,* 3 Atk. 200; *Angell v. Draper,* 1 Vern. 399; *Balch v. Wastall,* 1 P. Wms. 445; *Starr v. Rathbone,* 1 Barb. 70; *Mallett v. Bank,* 1 Barb. 217; *Wright v. Strong,* 3 How. Pr. 112; *Ware v. Canal Co.* 1 Halst. (N. J.) Ch. 410; *Caswell v Caswell,* 28 Maine, 232.

*The Act of 1835, ch. 380, sec. 2, Code of Pub. Gen. **316** Laws, Art. 16, sec. 35, gives the right, without judgment, to attack a *fraudulent conveyance;* but such is not this case. This is not a bill attacking a fraudulent conveyance; it alleges no conveyance, but a mere change of name covering the same parties and interests.

Fraud is alleged in order to force equity jurisdiction, but has it been proved? The answers, under oath, deny fraud, and these outweigh the allegations of the bill, and one witness swearing the same thing in support thereof. Story's Eq. sec. 1528; *Watkins v. Stockett*, 6 H. & J. 435; *Gelston v. Rullman,* 15 Md. 260.

It is admitted that J. B. Charron attempted, by direction of counsel, to cover or conceal his interest, as against the dry goods creditors. Was this a fraud? Even if it were a fraud, it was such only as against the dry goods creditors, of which they, alone, could complain. Does it lie in the mouths of these complainants to complain of fraud against others, and which did not injure them? *De Vallengen v. Duffy*, 14 Pet. 282; *Schooner Lion,* Sprague, 40; *Ayers v. Hewitt*, 19 Maine, 281; *Brooks v. Clayes,* 10 Vt. 37.

But further; did they not know of, and acquiesce in, this covering up of Charron's interest during eighteen months of J. B. Charron & Co.'s existence? And have they not stood quietly by and seen the various changes for ten months since the dissolution of J. B. C. & Co. without one word of complaint? And having thus silently approved for over two years, may they now complain of it? We think not. *Brig Sarah Ann,* 2 Sumner, 206, and 13 Pet. 38; *Skinner v. Stouse,* 4 Mo. 93.

*But both fraud and irreparable injury must be proven clearly* as a condition precedent to sustain an injunction. *Nusbaum v. Stein,* 12 Md. 315; *Davis v. Reed,* 14 Md. 152; *Hubbard v. Hubbard,* 14 Md. 356; *N. Y. Print. & Dyeing Establishment v. Fitch,* 1 Paige, 97; *Watson v. Hunter,* 5 John. Ch. **317** 169; *Roberts v. Matthews,* 18 Abbott, 199; *Mariposa Co. v. Garrison,* 26 How. Pr. 448; *N. Y. v. Mapes,* 6 John. Ch. 46; *Phettiplace v. Sayles,* 4 Mason, 312; *Catching v. Terrell,* 10 Ga.. 576; *C. & O. Canal Co. v. Young,* 3 Md. 480; *Armstrong v. Stamford,* 7 Minn. 49.

If, at the dissolution of J. B. Charron & Co., the division of stock was made *bona fide,* without any fraudulent purpose, the stock ceased to be partnership property, and became individual property, as completely as if sold in course of trade to a stranger, and is beyond the reach of partnership creditors by injunction. *Sanderson v. Stockdale,* 11 Md. 564; *Griffith v. Buck,* 13 Md. 102. Partnership creditors obtain no lien on or title to even partnership assets, until judgment, except when standing in place of a partner, or claiming under or in right of him. *Sanderson v. Stockdale,* 11 Md. 564; *Bean v. Smith,* 2 Mason, 252; *Fletcher v. Peck,* 6 Cranch, 87-133; *Swayze v. Burke,* 12 Pet. 11. To justify the appointment of a receiver, it must appear that the claimant has some *title* to the property, and even then it must be *clearly proved,* and the necessity of the most stringent character; and it must be clearly shown to the court that such measure is absolutely necessary to the ultimate security of the claimant. *Blondheim v. Moore,* 11 Md. 365; *State v. N. C. R. R. Co.* 18 Md. 193; *Sanderson v. Stockdale,* 11 Md. 564.

Alvey, J., delivered the opinion of the court:

Upon careful examination we discover nothing in this case to distinguish it from that of *Sanderson v. Stockdale,* 11 Md. 563; and, of course, the same relief that was given in that case should be afforded in this. It is true, the case of *Sanderson v. Stockdale* was heard on bill and exhibits only, and, in the case before us, the defendants have all filed their answers, denying most of the material allegations of the bill; but such denials **318** have been overcome or neutralized by the *facts and circumstances proved in the cause. There is no question made here of the right of partners, where the firm is solvent, to convert, by their own acts, the joint property of the partnership into the separate property of individuals, or into the joint property of two or more partners. This, it is conceded, may be done. And if done *bona fide,* and for valuable consideration, it will bind and preclude the antecedent partnership creditors.

But it is contended, that when such transfers are fraudulent, and calculated to hinder and delay the partnership creditors, they are void as against such creditors, and will not be allowed

to operate to their prejudice. And this proposition we think sound, and amply supported by authority. For while it is true that the joint creditors, as such, have no immediate or direct lien upon the partnership property, yet, they have a derivative or secondary lien, that can be worked out and made effectual through the lien of the partners; and which *quasi* or secondary lien of the creditors, constitutes an equity, that courts will recognize and protect, against the meditated fraud of the partners themselves. And hence, while the joint creditors have no right to impeach or call into question the *bona fide* sales or transfers of the partnership property, it has been uniformly held that it was necessary to the validity of such sales or transfers, as against the creditors, that they should be fair and *bona fide;* and where they have been found otherwise, as in the case of *Anderson v. Maliby*, 4 Bro. Ch. 429, and note; Coll. on Part. sec. 575, they have been declared inoperative as against creditors. *Ferson v. Munroe,* 1 Foster, (N. H.) 462; Pars. on Part. 395. And in this case, we think no candid mind can otherwise conclude than that the transfers of the stock in trade, and the transformations of the firm were intended to defraud the creditors of the firm of J. B. Charron & Co., by defeating their right to the appropriation of the partnership assets to the payment of their debts. The devices and disguises that seem to have been so constantly resorted to, are susceptible of *no other construction. They commence in May, 1865, **319** in the ostensible withdrawal of J. B. Charron, the leading member of the concern, when in fact he continued his connection with the firm, holding his real interest disguised and concealed in the name of a member of his family. In February, 1867, when this member, thus cloaking the interest of his father-in-law, desired to escape from the concern, it was deemed advisable that the firm should undergo an ostensible reconstruction, and then it was that Claude C. Charron, the irresponsible minor son of J. B. Charron, was put forward to take the place of his father; his father's interest, that had been held in the name of Richard, being transferred to him; and, so far as we can see, without any consideration whatever, but as a mere sham. Townsend, the traveling agent of the house, was taken in as a partner upon his paying three thousand dollars; and Richard's interest having been purchased

out by the firm, the three thousand dollars, paid by Townsend, were paid over to Richard, and the notes of the new styled firm given him for the balance of the price of his interest. The respective interests of Posey and of John B. Charron, now represented by C. C. Charron, in the firm of J. B. Charron & Co., were transferred ; and thus the firm of J. B. Charron & Co., composed of J. B. Charron, J. P. Posey and Stephen Richard, was transformed into Charron, Posey & Co.; the only real change taking place being the admission of Townsend in the place of Richard, and the shifting the interest of J. B. Charron from the name of one party to that of another. There was no assignable reason for any real change of the firm; but, on the contrary, the most manifest reasons against it. The creditors, who were materially interested in the change, seem never to have been consulted as to its propriety, or even informed of the intended transformation. They were left in ignorance not only as to the reasons for the change, but as to the persons composing the new firm. The only motive that can be perceived, for this transaction, is that the parties desired to place all the tangible property of the firm **320** of J. B. *Charron & Co., beyond the reach of its creditors, and that this was the contrivance resorted to as a means to effect that object. The surrounding circumstances of the transaction itself, the false and deceptive entries detected in the books, and the subsequent occurrences, all strongly indicate this to have been their purpose.

But it is said that the firm of J. B. Charron & Co., had, at the time of this change, assets amply sufficient to pay all of its debts ; and that provision was made for their liquidation by the appointment of Posey, the agent of the firm, to collect the outstanding debts and to pay off the creditors. To answer this suggestion, let us recall to mind the indisputable facts. According to the answers of J. B. Charron, and J. P. Posey, with but slight discrepancy, the indebtedness of the firm amounted to about $59,000. The stock in trade was valued at $15,000 ; and the debts due the firm were supposed to amount to about $102,000. These debts, however, were mostly due the firm from persons of the Southern States; and by reason of the distressed and embarrassed condition of the people, and the operation of stay laws, in those States, a large portion of the debts were

not collectible. The entire stock in trade, being the only tangible property of the firm that could be made available to the creditors for the payment of their debts, was transferred, and, of course, not intended to be reached by any legal process to which the creditors could resort. The outstanding debts due the firm were kept in the control of its members, to be collected and applied as they might think proper; so that the creditors were not only made to depend for payment of their debts, upon the chances of future collections that might be made from customers embarrassed by poverty, and hedged in by stay laws, but were also made to depend upon the sheer good will and pleasure of their debtors. They were therefore without an efficient remedy for the realization of their dues. There was nothing left within their reach, and so far as they were concerned, practical insolvency of the firm existed in February, 1867, *and still exists. For it matters but little what may have **321** been the stated amount of outstanding debts due the firm, if they were either worthless, or non-available to the creditors. And, as to the individual liability of the members of the partnership, it is not pretended that they have separate means of payment. So that, by the transaction of the 11th of February, 1867, the creditors have been deprived of the benefit of their remedies by due course of law, to do which was of itself inequitable and fraudulent.

If it had been at all doubtful at the time, as to what was the real purpose and design of this change in February, 1867, we think subsequent events make it manifest beyond question. Both John B. Charron and Posey, remain in the new styled firm, the former represented by his minor son, and the latter as an ostensible partner; and although it was said to be understood in February, 1867, when Richard withdrew, that Posey alone was to assume the duty of liquidation, it seems that J. B. Charron, shared it with him; and all the moneys that were subsequently collected, were taken into the new concern, and used by it; and only such creditors were paid, as the parties deemed it to their interest to pay. Subsequently, when the neglected creditors began to complain, and after Posey had managed to get his entire interest out of the concern, and in fact stood in debt to it, he, in September, 1867, went through the form of retiring, though upon condition that he was to be

retained in the service of the firm to be newly formed, of Charron, Townsend & Co., at a salary.   It was soon after this last ostensible change, that Posey submitted to the creditors of the firm, of J. B. Charron & Co., the condition of its affairs, and made to them the extraordinary proposition of the 27th of September, 1867.   For extraordinary it certainly was, for a firm that pretended to be entirely solvent in February, preceding and able and willing to pay all of its debts.   According to the statement submitted to the creditors, Posey supposed that of the remaining debts due the firm, amounting in the aggregate to **322** $65,897.33, about $27,716.77, *might be realized.   Of the whole amount due, he put down the small sum of $4,711.60, as worth par, and that due on open accounts.   And of the entire remainder of the debts due, he estimated $31,074.96, of them to be worth fifty cents in the dollar, and the balance of $30,110.77, to be worth only twenty-five cents in the dollar.   The debts of the firm remaining to be paid, amounted to $21,326.30.   Posey, after collecting in and appropriating in his own way, as many of the available assets as he could, then proposed to the creditors of the firm of J. B. Charron & Co., " to settle up the business for the sole benefit of its creditors, (they allowing him a moderate compensation for his services,) to pay over to them all moneys as received *pro rata, (provided they all agree to the arrangement,)* or if preferred by them, he will transfer and assign all the books, notes and entire assets to them, *provided they will give him a release in full."*   Thus the creditors are put to the alternative of either employing Mr. Posey, at a salary, to gather in what he could, or might think proper, of the doubtful debts due the firm, or to assume the work of collection themselves, and give Mr. Posey a full release.   And this would seem to be designed as the consummation of the whole plan of operations.   John B. Charron and Richard had made their escape from the concern, and it now remained for Posey to make his, and to leave the creditors to take care of themselves. Certainly a very convenient and easy mode of winding up partnership affairs, so far as the partners are concerned, but not. very just or equitable to the creditors.

It is said, however, that whatever fraudulent purpose may have been contemplated by John B. Charron and J. P. Posey, that Claude C. Charron and Townsend, the parties constitut-

ing the firm of Charron, Townsend & Co., were ignorant and innocent of it. But that is not our conclusion from the facts of this case. We think they were fully aware of the condition of the firm of J. B. Charron & Co., and were privy, and contributed to the fraudulent schemes and devices to hinder and delay its creditors. The firm, of which they pretend to *be the only partners, is but the fraudulent transforma- **323** tion of the firm of J. B. Charron & Co., conducting its business on the stock in trade that properly belongs to that firm, and which equity requires should be applied to the payment of its debts.

It was contended in argument, that whatever might be thought to be the true character of the transaction of the partners in transferring the partnership property, there could be no proceeding had in a Court of Equity, for the purpose of avoiding such transfers until after judgment and execution at law, creating a lien upon such property. But we think there is no force in the objection. The case is plainly embraced by the very terms of the Code of Pub. Gen. Laws, Art. 16, sec. 35, which declares that " in no case of a proceeding in equity to vacate any conveyance, *or contract, or other act,* as fraudulent against creditors, shall it be necessary for any creditor or plaintiff in the cause to have obtained a judgment at law on his demand, in order to the relief sought in the case." Besides, the same objection was raised in *Sanderson v. Stockdale,* 11 Md. 564, and the court overruled it, distinguishing that case from the case of *Uhl v. Dillon,* 10 Md. 500.

It follows, from what we have said, that we regard the case as a proper one for both an injunction and a receiver, in accordance with the prayer of the bill. We shall, therefore, affirm the order of the 2nd of April, 1868, from which the several appeals have been taken, so far as it continued the injunction against John B. Charron, Stephen Richard, and John P. Posey, and granted the prayer for a receiver as to the firm of J. B. Charron & Co., and shall reverse said order so far as it dissolved the injunction against Claude C. Charron and John M. Townsend, and the firms of Charron, Posey & Co., and Charron, Townsend & Co.; the question of the refusal to appoint a receiver, as to these latter firms, not being before us on this appeal, the cause will be remanded to the court below, that fur-

**324** ther proceedings may be had therein *in accordance with this opinion, and that the same may be brought to° final hearing and determination.   The costs to await the final result.

*Order affirmed in part, and reversed in part, and cause remanded for further proceedings.*