### JOHNSTON and others *v.* STRAUS and another.

(*Circuit Court, E. D. Virginia.* November 27, 1882.)

1. PARTNERSHIP—INSOLVENCY—RETIRING PARTNER—CREDITORS' BILL.
   Where the insolvency of a firm is self-proclaimed, and one partner, Iseman, for a pecuniary consideration, and the undertaking of the other partner, Straus, to pay the debts of the firm, retires from the concern, leaving all the social goods, claims, and choses in action in the possession of Straus, who proceeds to sell and collect, and advertises in a public newspaper that the firm has been dissolved, and that he will continue in the same business, and settle the debts of the concern, *held*, that here was a transfer of the partnership effects from the firm to Straus; such a transfer as gave to creditors at large of the firm a right to file a bill in equity under the authority of section 2 of chapter 175, p. 1126, of the Code of Virginia, (1873,) which authorizes suit to be brought before judgment is obtained or execution levied or returned.

2. SAME—EQUITY JURISDICTION.
   *Held*, upon the proofs in this case, that jurisdiction in equity attached independently of the charge of actual fraud; that it attached on other grounds, on which *per se* equity may proceed, viz., on the right of creditors and of the members of the partnership to an account; also on the ground of the trust imposed upon Straus resulting from his holding effects which had been the subject of a *voluntary* transfer from the firm to himself; and also on the ground of constructive fraud in the transfer by the firm of the partnership effects to Straus.

3. SAME—MOTION TO DISMISS.
   *Held*, that after answer filed, full proofs taken, and final argument of counsel, final hearing by the court, and a decision of the principles of the case, it

was too late to move for dismissal for want of jurisdiction, on the ground that no one of several complainants in the bill held a matured claim against defendants amounting to $500; it appearing from the bill that each complainant held other claims not yet payable. making, with those due, more than $500, none of which were disputed by the defendants, who were confessedly insolvent.

4. STATE LAWS—CONSTRUCTION BY STATE COURTS—FEDERAL COURTS.

Where the law of a state determines the rights of suitors and those rights come before a federal court, either in a case at law or in equity, for adjudication, that court is bound to accept such exposition of the meaning of the state law as the court of last resort of the state has given it.

5. SAME—SETTING ASIDE VOLUNTARY TRANSFER.

Accordingly, in a suit in equity in a federal court, founded upon the second section of chapter 175 of the Code of Virginia, which gives the right to a creditor at large to file a bill for setting aside a voluntary transfer of property, and seems to give a lien to the suing creditor, on defendant's estate, from the date of the filing of the bill, which effect it had been decided to have by the supreme court of appeals of Virginia, *held*, that the federal court must respect the lien so declared to exist, and distribute the fund in its hands according to the priority attaching to it, rather than by the rule of *pro rata*.

In Equity.

*John A. Coke*, for complainants.

*Meredith & Cocke*, for defendants.

HUGHES, J.　David Iseman and C. E. Straus were wholesale liquor dealers in Richmond, Virginia, under the firm name of Iseman & Straus. Their capital in trade originally put in was $6,000, and wholly borrowed. They were, according to the first arrangement, to furnish equal amounts of capital; but in the result Iseman put in $4,000, and Straus $2,000. Their business was commenced on or about February 1, 1881. On the seventh or fourteenth day of that month they reported to the agent of the mercantile agency of R. G. Dun & Co. as follows, as testified to from memorandum made at the time by T. Scarlett, Dun & Co.'s agent:

"FEBRUARY 14, 1881.

"New firm composed of David Iseman, formerly salesman for L. Stern & Bro., this city, and Chas. E. Straus, who formerly conducted the clothing business here. They state that they have a capital of $6,000 to $8,000 in their business, equally contributed; that Iseman has an interest in a farm in Louisia county, Virginia, worth about $600, and has besides outside means of some $2,500. Iseman formerly did business in Spottsylvania county, Virginia, where he owns a farm, but it does not stand in his name, consequently it is not liable for his debts. Refer to Planters' National Bank and L. Stern & Bro., Richmond, Va."

Ball, agent of Bradstreet's Mercantile Agency, reported as of the third February, 1881, from information derived from one of the firm, as follows:

"C. E. Straus states: 'We are just commencing, and have a cash capital of $6,000, equally contributed. Iseman is worth $3,000 or more. Straus borrowed $2,000, and had $1,000 of his own.'"

About a year afterwards, say February, 1882, these agents called again, and the firm reported their condition as about the same as before. Eight months later there appeared in the Richmond news-

papers, of the morning of September 27, 1882, the following announcement:

"RICHMOND, VA., September 25, 1882.

"DISSOLUTION. The copartnership heretofore existing between us, under the style of Iseman & Straus, is this day dissolved by mutual consent. C. E. Straus assumes the liabilities of the old concern, and is authorized to collect all debts due it. DAVID ISEMAN.

"CHARLES E. STRAUS.

"I take this opportunity to inform my friends that I will continue the wholesale liquor business at the old stand of Iseman & Straus, 1302 Cary street, and solicit a continuance of their kind patronage.

"C. E. STRAUS."

There were no articles of dissolution executed by the partners. A paper signed by the two, as above published, was the only writing executed on the occasion of the dissolution. But it is shown by evidence that Straus executed his individual notes for $4,000, indorsed by his mother, to Iseman, as an inducement to Iseman's retirement from the firm. There was no formal transfer of the stock of goods, held at the time of the dissolution, from the firm to C. E. Straus, who remained in custody and possession of the goods. There was no formal assignment of the debts due the concern from the firm to C. E. Straus, who did in fact take charge of all collections, and did collect, it seems, some $1,100.

A few days after the dissolution, C. E. Straus wrote the following circular letter, in manuscript, to the creditors of the firm; those few passages being italicized by me, which indicate that there had been a transfer of property and effects of the firm to Straus, and that he regarded them as his own property held in common with his individual real estate and other means:

OFFICE OF ISEMAN & STRAUS,
WHOLESALE LIQUOR DEALERS, AND DISTILLERS' AGENTS,
1302 CARY STREET.

RICHMOND, VA., September 28, 1882.

*Messrs. Frieburg & Workum—*GENTS: I have already notified you of the fact that the firm of Iseman & Straus dissolved on the twenty-fifth of September, *that I have taken the stock and debts due the concern,* that I am to pay off all the debts due by the concern, and that I propose to run the business in my own name. I deem it proper to state to you that the dissolution was caused by the failure of my former partner to attend closely and properly to his department of the business; and that, owing to this neglect on his part, the business of the concern has become very much involved, and has sustained heavy losses. The object of my letter is to ask your indulgence until I can get in such a condition as to pay off all creditors in full without being forced to close up *my business at a sacrifice to my creditors and myself.* Inclosed you will find a statement of *my liabilities and assets,* from which you will perceive that my liabilities amount to about $29,000, and that *my real estate, stock, and good debts,* at their full value, would not realize more than about $23,000.

Now, if I can succeed in securing from you and my other creditors an extension of 6 and 12 months, for which I propose to give my notes, with legal

interest added, then I will be able, by careful and judicious management of my business, to pay up in full.

On the other hand, should my creditors insist on an immediate would feel then I *would be forced to make a deed of assignment,* in which I settlement, it my duty to *prefer* my accommodation indorsers to the amount of $10,000. The net value, after paying the costs of selling under the deed of assignment and the preferred creditors, would pay only a small percentage of the other debts, and it is highly probable that *my real estate and stock* would be sold at a sacrifice, and that it would take from 6 to.12 months to collect all the good debts and distribute the money among the creditors.

Under these circumstances I think you and the other creditors will be far more benefited by an extension than by forcing me to an immediate settlement. Please reply at once, as I must decide without delay what course to pursue.

Very truly yours,                              CHAS. E. STRAUS.

STATEMENT.

*Liabilities.*

| | |
|---|---:|
| Merchandise accounts, | $19,000 |
| Accommodation indorsers, | 10,000 |
| Total liabilities, | $29,000 |

*Assets.*

| | |
|---|---:|
| Stock of goods on hand about | $ 5,000 |
| Good debts due I. & S. " | 15,000 |
| Real estate belonging to C. E. Straus, | 3,000 |
| Total, | $23,000 |

It is probable that something may be made out of about $6,000 of bad and doubtful debts.

One of the witnesses, H. B. Boudar, an expert in book-keeping, makes a statement, drawn from the books of the concern, which shows that on the first February, 1882, the capital had been reduced from $6,109.93 to $618.04; but C. E. Straus makes a counter-statement, claiming a capital, at the date mentioned, of $3,326.59. Statements and counter-statements of plaintiffs' counsel, and of C. E. Straus, respectively, show a deficit on the second October, 1882, between the assets and indebtedness of the firm, to the amount of $9,000, disclosing a total loss of the capital, and positive insolvency, as admitted in the circular letter.

Upon this condition of facts, the complainants, none of whom had obtained judgments against the firm, exhibited their bill in this court on the second October, 1882, eight days after the dissolution of the firm, charging actual and constructive fraud, praying the appointment of a receiver, and for an injunction, and for the usual relief proper in such a condition of affairs. An order was at once given, directing the marshal of this court forthwith to take possession of the goods in the store-house, 1302 Cary street, Richmond, temporarily restraining the defendants from interfering with the said goods, and from making collections of the debts due the firm, and fixing a future day for hearing the prayer for a preliminary injunction. Since then

full proofs have been taken by the parties to the cause, argument has been had as upon a final hearing, and the cause is by consent before me for a final decree.

The primary and principal question in controversy is as to the competency of this court, as a court of equity, to entertain the bill exhibited in this cause, and to grant the relief for which it prays. That the firm of Iseman & Straus was insolvent on the day of dissolution is too plain for discussion, and is virtually admitted; and the question of the competency of this court to entertain the bill and grant the relief sought depends upon the condition of the property and assets of the firm at the time the bill was filed, to-wit, on the second October last.

The firm was confessedly and hopelessly insolvent. Iseman had retired from it, and had left Straus in custody of the goods, with full power to collect the claims due from customers; and this had been advertised to the world in a public newspaper. Moreover, Iseman had accepted, as a consideration for doing what he did, the notes of Straus, satisfactorily indorsed, for $4,000. Straus had written to all creditors a letter expressly stating and necessarily implying that the goods and all uncollected claims had become his separate property. If, in consequence of these transactions, there was a transfer from the firm to Straus, then the firm being insolvent, and the rights of creditors imperiled, the transfer on the part of Iseman was voluntary, and on the part of the firm constructively fraudulent; and it became competent for a court of equity to avoid the transfer, under section 2 of chapter 175 of the Code of Virginia, and to take charge of and administer the effects according to the equities of the case. For, if there was a transfer, its effect was to produce a radical change in the character of the property, which ceased longer to be social effects liable primarily for the debts of the firm, and only secondarily for those of its individual members, and became individual effects, liable primarily to the debts of Straus, and secondarily to those of the firm. Colly. Partn. (Perkins' Ed. 1853) § 174.

A transfer having such an effect falls plainly within the contemplation of section 2 of chapter 175 of the Code of Virginia, which declares "that a creditor, before obtaining judgment or decree for his claim, may institute a suit to avoid a gift, conveyance, assignment, transfer of, or charge upon the estate of his debtor, which he might institute after obtaining such a judgment or decree." If there was in this case such a transfer of the partnership property of the insolvent firm as this statute contemplates, then the effect of it was to bring the present case within the ruling of the supreme court of appeals of Virginia in the case of *Wallace* v. *Treakle*, 27 Grat. 486, 487, in which the court said:

"Previous to section 2 of chapter 175 of the Code, first enacted in the Code of 1849, it was the settled rule of the courts that a creditor at large could not resort to a court of equity to impeach any conveyance made by his debtor, on

the ground of fraud. If real estate was the subject of the conveyance, a judgment was regarded as sufficient. If goods and chattels, or any equitable interest therein, although incapable of being levied on, were embraced in the conveyance, the creditor was required to take out execution, and have it levied on or returned, so as to show that his remedy at law failed. * * * Section 2 was intended to afford a remedy in such cases, and to declare that a party creditor who filed his bill to avoid a fraudulent conveyance acquired a lien upon the property of the debtor conveyed in such void conveyance, if he obtained a decree setting it aside, and in that event the lien attaches from the day the bill is filed."

Proceeding still on the hypothesis that there was a transfer of the social effects in this case to Straus, such as gave the complainants the right to proceed without judgment, the next question arising is whether they had a right, on general principles of equity, to bring this bill.

If A. and B. are partners, and are pecuniarily embarrassed, and convey goods which they hold in common in payment of a debt due by B. individually, the transfer is voluntary, and constructively fraudulent on the part of A. For A. was entitled to require that the whole value of the goods should be appropriated to the discharge of the joint debts, and he cannot forego this right in favor of B., or of his own separate creditors, without a manifest wrong to the creditors of the firm. See White & T. Lead. Cas. (Hare & W. Ed.) pt. 1, p. 394. If a person or firm is indebted at the time of a voluntary transfer of property, it is presumed to be fraudulent in respect to debts antecedently due; and no circumstance will permit these debts to be affected by the transfer, or to repel the legal presumption of fraud; and this is so without regard to the amount of the debts or the extent of property. The law disables the debtor from making any voluntary settlement of his estate to stand in the way of existing debts. Some authorities hold that this doctrine is qualified in favor of third persons who come *bona fide* into possession of the property transferred. But this is the only qualification; and it does not apply in this case at bar, where there are no innocent third persons whose rights are involved. See *Case* v. *Beauregard*, 99 U. S. 119.

From the right of the firm (and of its creditors) to the partnership assets results the duty of its members to see that they are appropriated to the payment of the joint debts. For this purpose each member of the firm has an equitable lien extending to the whole of the common stock, to which member's lien the partnership creditors may be subrogated as against the partners individually and their separate creditors. 2 Lead. Cas. Eq. pt. 1, p. 401, and cases there cited. Therefore, if in the present suit there was a transfer of the effects of the firm to Straus, and that transfer be *avoided* or set aside as voluntary and constructively fraudulent, then the jurisdiction of equity to proceed with the cause is founded upon the right of subrogation just stated, which equity gives to creditors of the firm. The lien of partners and of creditors by subrogation upon the whole funds of the part-

nership, for the balance finally due to the partners respectively, seems incapable of being enforced in any other manner than by a court of equity through the instrumentality of a sale. Besides, the creditors of the partnership have the right to have their debts paid out of the partnership funds before the private creditors of either of the partners. But this preference is, at law, generally disregarded; in equity, it is worked out, as before indicated, through the equity of the partners over the fund. 1 Story, Eq. Jur. § 675. Where a dissolution of the firm has taken place, an account will not only be decreed, but, if necessary, a manager or receiver will be appointed to close the partnership business and make sale of the partnership property; so that a final distribution may be made of the partnership effects. 1 Story, Eq. Jur. § 672. The jurisdiction of the court of equity, although it may attach on the ground of actual or constructive fraud, or accident or mistake, is not necessarily dependent upon them; but may be exercised on other distinct grounds in which the subject-matter is *per se* within the equitable jurisdiction. Among these are matters of account; and, as incident thereto, matters of partnership. 1 Story, Eq. Jur. § 441. Cases of account between partners fall under the considerations which give to courts of equity concurrent jurisdiction with courts of law in matters of account. If the transfer of the partnership goods to Straus, in the case at bar, be set aside by this court, then Straus would be held to have been, before this suit was brought, in contemplation of equity, the trustee or agent of the members of the firm for the partnership creditors, to manage the fund in their respective interests. As such, if Straus was bound to keep the property of the firm distinct from his own, and if he mixed, or was about to mix, it up with his own, the whole would be taken to be the property of the firm; and a court of equity, through its original inherent and independent power as such, would have jurisdiction to enforce the right of the retiring partner and the social creditors to a proper administration of the fund. 1 Story, Eq. Jur. §§ 466–468, 504. It is not essential to the vindication of the equity of partnership creditors that the assets shall have passed from the hands of the firm into those of an assignee, and a chancellor may, on proof of insolvency, and that there is good ground for believing that the partnership property has been or will be misappropriated, award an injunction at the instance of a judgment creditor, and appoint a receiver to wind up the business of the firm. *Collins* v. *Hood*, 4 McLean, 186; *Jones* v. *Lusk*, 2 Metc. (Ky.) 356; and numerous other cases cited in 2 Lead. Cas. Eq. pt. 1, p. 401. In Virginia, Maryland, and some other states this will be done at the instance of creditors at large. *Washburn* v. *Bank of Bellows Falls*, 19 Vt. 278; *Hubbard* v. *Curtis*, 8 Iowa, 13; *Thompson* v. *Frist*, 15 Md. 24; *Sanders* v. *Young*, 31 Miss. 111, cited in *Silk* v. *Prime*, 2 Lead. Cas. Eq. pt. 1, p. 404; and the Illinois case of *Rappleye* v. *International Bank*, 93 Ill. 396.

I have gone more largely into this question of the general equity

jurisdiction in matters of account, partnerships, trust, and construct-
ive fraud, because, on these grounds, the court has abundant juris-
diction to entertain the present bill, and grant the relief it prays,
without considering the question of actual fraud, so elaborately dis-
cussed by counsel on either side. The question of actual fraud has
been entirely pretermitted by me in arriving at conclusions in this
case. I am free, however, to say that if it had been necessary to
pass upon that question, I would not have felt justified in basing a
decree on that ground, and do not think that actual fraud had been
practiced. Nor would I be understood as implying, from what has
been said on the general jurisdiction of equity in matters of trust,
account, constructive fraud, and partnership, that a court of equity
could not entertain such a bill as this of complainants here, and on
general grounds of equity jurisdiction take possession of partnership
goods recently transferred and still existing *in specie*, and readily
found and identified, independently of section 2 of chapter 175 of the
Code of the state. It is unnecessary, in the present suit, to consider
that question, the statute giving all needed authority.

It may be proper to inquire whether Iseman had power to make
the transfer to Straus which he is claimed to have made by com-
plainants. I think this right was clear. In *Jones* v. *Lusk*, before
cited, it was held that a sale by one of the partners to the others, of
his interest in the firm, passes the right of property as between the
partners, and against all the world except the partnership creditors,
but can be impeached by the creditors by a bill in equity; and such
is the teaching of all the authorities. It is a general principle that
one partner may sell his interest as well to his copartner as to another
purchaser; and if the sale be valid, it will vest the exclusive title in the
purchaser. *Ex parte Ruffin*, 6 Ves. Jr. 119, 126; *Ex parte Williams*,
11 Ves. Jr. 3; Story, Partn. § 510. If the consideration of the transfer
be that the partner buying shall pay the debts of the firm, this will
not, by mere force of the contract, raise a trust in favor of the cred-
itors. Inasmuch as they derive their lien from or through the part-
ners, and as the retiring partner parts by the sale with his lien, and
takes the personal security of the other to pay the debts, the lien is
lost through which the creditors may work out their equity as against
the assets of the firm. 2 Lead. Cas. Eq. pt. 1, p. 399.

In view of these general principles respecting the powers of a part-
ner, it is clear that Iseman could have transferred his rights in the
partnership effects to Straus, and that, if the partners so intended to
do by their dissolution of September 25, 1882, they were competent
to make the transfer. If they made it, then it was competent for this
court, as a court of equity, to entertain a bill to set it aside, with a
view to a sale, and to a distribution of the proceeds according to
the equities of the case. The only question, therefore, remaining to
be considered, is whether there was such a transfer as, upon the prin-
ciples that have been enunciated, should be set aside by this court,

under the authority of section 2 of chapter 175 of the Code of Virginia. It may be conceded that there was no formal, express, or explicit transfer; that there was no writing in the nature of a conveyance or assignment. If the effects of the firm had been realty instead of personalty, it might have been doubted whether, without such a conveyance, there was an effective transfer of title or property. But the effects were personalty, transferable by delivery. They were personalty which had been in the joint possession of the firm, and of which one partner relinquished his joint possession to the sole possession of the other partner. The retiring partner sold his interest in the effects of the concern for a consideration; that consideration being notes, satisfactorily indorsed, for $4,000, and the undertaking of Straus that he would pay the debts of the firm. Can it be pretended that Iseman, after having received the $4,000 of consideration money, or its equivalent, and signed the agreement of dissolution, and retired from the joint custody of the goods, and relinquished the joint collection of the claims of the firm, for eight days, could have gone back to the store-house, and resumed his joint proprietorship of the goods and a joint control in the management of the business? I think it is perfectly clear that he could not have done these things; and that he could not have done them is itself a demonstration of the fact of transfer.

It may be conceded that mere dissolution does not of itself operate a transfer of the social effects to a partner who, as successor to the firm, assumes the settlement of the partnership affairs. It may be conceded that an authority given to one partner by the other to close all the business transactions of the firm does not of itself operate as a transfer of partnership effects. But these are propositions applicable only to solvent partnerships. It may be conceded that, in general, no dissolution of any kind affects, in the eye of equity, the rights of third parties, who have had dealings with the partnership, without their consent. None of these propositions conflict with counter-propositions in regard to insolvent partnerships like that of Iseman & Straus.

In order to convert joint into separate property, it is not necessary, in the case of goods *in specie,* that there should be a deed of assignment to the remaining partner. Delivery of the goods, coupled with due notice that the partnership is dissolved, and that the remaining partner will pay the debts of the firm, is sufficient evidence of an agreement to change ownership. Colly. § 895, (Ed. 1853.) This principle was established by the case of *Ex parte Williams,* 11 Ves. Jr. 3, and has been adopted as settled law by all courts and text writers for nearly a century. In that case, Shepherd & Smith dissolved their partnership on the fifth of September, 1803, and advertised the fact in a newspaper on the twenty-fifth of the succeeding November, with a statement that all debts would be paid by Shepherd. Shepherd went into bankruptcy in December, having still on hand, *in*

*specie,* property which had belonged to the firm. The question was whether this property had remained social effects, or had become the separate property of Shepherd by having passed as such to his assignee in bankruptcy; and it was determined by Lord ELDON, that they were separate effects, and had passed to Shepherd's assignee. In that case there was evidence of a formal agreement that the property should pass to Shepherd, as there is evidence here that for the consideration of notes for $4,000 satisfactorily indorsed, and payment of the debts of the firm, Iseman sold his interest in the goods to Straus. The case of *Ex parte Williams* rules the present case, and I will decree for the complainants.

---

After the foregoing decision of the court had been rendered, counsel for defendants moved to dismiss for want of jurisdiction, on the further ground, not before raised, that no one of the complainants, at the date of the commencement of the suit, held any claim already due and payable amounting to $500, the amount necessary in all cases to give jurisdiction to a United States circuit court. The bill had set forth that the complainants were some of them citizens of Ohio, and others citizens of New York; that W. W. Johnson & Co., complainants, held a matured acceptance of the defendants for the amount of $308, and that defendants owed the said complainants the further sum, not yet due, of $1,235.17; that complainants Cook & Beauheimer held an acceptance of defendants due the third day of October, 1882, for $280.22, and a further claim not yet due of $298.41; that Rheinstrom & Bro. held claims against defendants, by acceptance and upon account not yet due, to the amount of $1,781.41; and that complainants the Mill Creek Distilling Company held claims, by acceptance and open account, against defendants to the amount of $1,803.84,—all of which are set out by exhibits filed with the bill. The answer of defendants makes no denial of the claims of the complainants for the amounts enumerated. The motion was denied, on grounds stated as follows, by

HUGHES, J. There is no denial by the defendants, in their answer to the bill, that any of the sums claimed by the complainants to be due them, respectively, are just claims. Some of those which were not due at the filing of the bill in the afternoon of the second October, 1882, have since matured, and matured before the filing of the answer.

It is perfectly true, and it is well-settled law, that if no one of the claims of any separate complainant, against the defendant in a cause, amounts to $500, jurisdiction cannot be created by several complainants combining their respective claims into an aggregate until the whole reaches $500. If that were the case at bar, the mo-

tion of defendants would be promptly granted, and the cause dismissed. But each one of the complainants here has an acknowledged claim exceeding $500, and the only objection which can be charged against the jurisdiction of the court is that part of the amounts due by the defendants were not actually payable at the time the bill was filed. Ordinarily in equity, and probably always at law, this objection also would defeat the jurisdiction of a United States circuit court; but here insolvency was charged, and is virtually confessed. The goods seized, which were the principal fund out of which the claims of complainants could be paid, had recently passed into the individual possession and become the individual property of one partner, and he, as the record and proofs show, the least responsible partner of the two. Most of the goods so transferred could yet be found *in specie* and identified, but there was danger every hour that they would disappear and become intangible; and unless the court could act before other debts of defendants matured for payment, complainants would lose all remedy in a United States court. I think the admitted fact of insolvency, the acknowledgment by defendants of the indebtedness charged in the bill, and the imminent peril of the goods, made a case for the interposition of this court, as a court of equity, too strong to be overcome by the technical objection that part of claims acknowledged to be due had not yet matured for payment.

The reason for thus ruling is the stronger in the present case, as the motion under consideration was not made until after answer was filed, full proofs taken, elaborate argument of counsel at final hearing was had, and a decision formally rendered by the court on all the points raised in the case.

---

At a further hearing of this cause on the seventh December, 1882, the question argued was whether the court, in disposing of the funds arising from the sale of the defendants' stock of goods, and the collection of the claims due this late firm from creditors, would first pay the complainants in this bill, or would distribute the fund *pro rata* among the creditors generally. Some half dozen of the creditors, on or about the day after the filing of the bill, obtained confessions of judgment for their claims, and established liens in their favor by taking out executions on these judgments. Counsel for complainants (John A. Coke) insisted that they had a lien upon the funds in the cause from the date of the filing of the bill; citing, in support of his petition, *Wallace* v. *Treakle*, 27 Grat. 479; *Coates* v. *Muse*, 1 Brock. 539, 543; *Green* v. *Neal's Lessee*, 6 Pet. 291; *D'Wolfe* v. *Rabaud*, 1 Pet. 476; *McCalmont* v. *Lawrence*, 1 Blatchf. 232; *Leffingwell* v. *Warren*, 2 Black, 599; and 2 Abb. Nat. Dig. 63, 64. Counsel for defendants (Mr. Meredith, of Meredith & Cocke) insisted that the proper rule was a *pro rata* division of the fund; citing, in support of his contention, Conkl. Pr. 658; *Neves* v. *Scott*, 13 How. 270; *Pennsylvania* v.

*Wheeling Bridge Co.,* Id. 563; *Noonan* v. *Lee,* 2 Black, 509; 1 Pom.
Eq. Jur. 444, 445; *Washburn* v. *Bank of Bellows Falls,* 19 Vt. 291;
*Flack* v. *Charron,* 29 Md. 311; and *Collins* v. *Hood,* 4 McLean, 187.

HUGHES, J. If the court had jurisdiction of this cause by virtue
of the original inherent jurisdiction of a court of equity, it would prob-
ably be its duty to distribute the fund in its hands *pro rata* among
creditors; and this, on the favorite principle of chancery courts that
*equality is equity.* It might be its duty, moreover, to require that the
bill of any creditor brought to create a charge upon the assets of a
partnership should be a creditors' bill filed, on the part of the imme-
diate complainant, for himself and all other creditors who might come
into the suit. As I have already said, however, in the original opin-
ion filed in this cause, the bill here is brought under authority of sec-
tion 2 of chapter 175 of the Code of Virginia. That section allows
"a creditor," meaning any creditor, to file a bill on his own account
alone, for the purposes indicated by the section, before obtaining
judgment. It does not require this creditor to bring a general cred-
itors' bill, and it fixes the rights of the creditor suing, as to the posi-
tion in which he shall stand among creditors, in the order of distri-
bution. It declares that, if successful in his suit, he shall have "all
the relief, in respect to the estate of the defendant, which he would
be entitled to after judgment or decree for the claim" for which he
sues. The meaning of this language of the section may not orig-
inally have been free from ambiguity; indeed, it was not; but it has
been construed by the court of highest resort in Virginia to mean that
such a bill operates as a lien from the day on which it is filed; and
that it establishes for the complainant the right to be paid, out of the
fund which is the subject of suit, in preference to all creditors whose
liens or claims are of equal dignity with his own.

The language of the supreme court of appeals of Virginia, in *Wal-
lace* v. *Treakle,* 27 Grat. 487, in commenting upon this section, is, (the
italics being that court's:)

"It is plain that, by the very terms of this statute, the creditor assailing
successfully a fraudulent conveyance, is placed in the same position, and is
entitled to the *same relief,* as if he had already obtained a judgment or decree
against his debtor. What is that position, and what is that relief? Plainly
*a lien* upon the property of the debtor; just as if he had, at the filing of his
bill, already obtained a judgment or decree. The statute places the creditor
who assails a fraudulent conveyance, if he succeeds in vacating it, in the po-
sition of one already having obtained a judgment or decree, and his lien sub-
sists from the time of filing his bill. It is plain that creditors filing a bill to
set aside a fraudulent conveyance acquire a specific lien, and one entitled to
priority over other creditors at large."

Such being the statute law under which this suit is brought, and
such being the clear and emphatic interpretation of that law by the
court of last resort in the state, the question with me is whether I
should accept that interpretation of the statute or distribute the fund

in this cause on some other rule.    This question has often arisen in the courts,—especially in the federal courts.    It is well settled—indeed, it is settled by statute (thirty-fourth section of the judiciary act of congress, 1 St. at Large, 92)—that the laws of the several states, not in conflict with those of the United States, shall be the rules of decision in "trials at common law" in the courts of the United States; and therefore the question before me is narrowed to the inquiry whether, in cases not at common law, or, like the one at bar, cases in equity, statutes of the state affecting the rights of parties, and proceedings in court, furnish the rule of decision for federal courts of equity, and whether the interpretation put upon those statutes by appellate state courts must be adhered to and enforced by federal courts of equity.

We have an important precedent on this point in an early decision of this very court, in an equity case.    That was the case, tried in 1822, of *Coates' Ex'x* v. *Muse's Adm'r*, 1 Brock. 537, in which Chief Justice MARSHALL said:

"It is always with much reluctance that I break the way in expounding the statute of a state; for the exposition of the acts of every legislature is, I think, the peculiar and appropriate duty of the tribunals created by that legislature.    Although, if a case depending on a statute not yet construed by the appropriate tribunal comes on to be tried, the judge is under the necessity of construing the statute, because it forms a part of the case, yet he will yield to this necessity only where it is real, and when the cause depends upon the statute.    The reluctance with which he yields to it is increased when, as in this case, the language of the act is sufficiently ambiguous to admit of different constructions among intelligent gentlemen of the profession. In such a case he will be particularly anxious to avoid giving a first construction, and will avoid it, if the case can be otherwise decided."

All this implies that where the law of a state determines the rights of parties, and those rights come before a federal court, either in a case at law or in equity, for adjudication, that court is bound to accept such exposition of the meaning of the law as the state courts have given it, and ought not to give an exposition of its own unless there has been no previous exposition of it by state courts.    I see many decisions in apparent conflict with this principle, but none that are in real conflict.    Where the state law fixes the rights of parties, and equity need not resort to its own principles for the determination of those rights, in such cases it cannot do so, even though its own principles may seem more consonant with natural justice.

In the present case we are not in the dilemma deprecated by Judge MARSHALL.    There has been an exposition of the precise meaning of the law on which this bill is founded, given, fortunately, by the state's court of last resort; and as this second section of chapter 175 of the Code is one which determines rights, and not merely prescribes a remedy, I feel bound to rule in conformity with the decision in *Wallace* v. *Treakle*.    It is there decided that when the complainant files such a bill as it authorizes, and succeeds in his suit, he acquires

a lien upon the property of the defendant from the date of the filing of the bill, as against all junior lienors and creditors at large. I will decree accordingly.